UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| ROBERT "LEE" LEROY PASSMORE, III, INDIVIDUALLY AND AS NEXT FRIEND OF MADELINE PASSMORE AND ABIGAIL PASSMORE, MINORS; AND KELLY PASSMORE;<br><br>    Plaintiffs,<br><br>v.<br><br>BAYLOR HEALTH CARE SYSTEM D/B/A BAYLOR MEDICAL CENTER OF PLANO; BAYLOR REGIONAL MEDICAL CENTER OF PLANO; AND KIMBERLY MORGAN, APN<br><br>    Defendants. | CIVIL ACTION NO._____<br><br>DEMAND FOR JURY TRIAL |

**PLAINTIFFS' ORIGINAL COMPLAINT**

TO THE HONORABLE COURT:

COME NOW Plaintiffs complaining against the Defendants, and alleging the following:

**I.**

**JURISDICTION AND VENUE**

1.   This Court has jurisdiction and venue is proper because one or more acts or omissions forming the basis for liability occurred in Dallas County, Texas, the Defendants are corporate entities located in Dallas County, Texas, and this lawsuit may affect the outcome of a pending bankruptcy proceeding.  [*See* 28 USC 1334(b)].

2.   The bankruptcy proceeding mentioned above is Case No. 1:13-bk-20510 *In Re Christopher Daniel Duntsch*, filed in the United States Bankruptcy Court, District of Colorado.

## II.

## PARTIES

3. Plaintiffs are individuals residing at 15690 Buffalo Creek Drive, Frisco TX 75035. Leroy Passmore is the patient involved in this claim. Kelly Passmore is his spouse. Madeline and Abigail are their minor children.

4. Defendant Baylor Health Care System is a corporation with its Registered Office at 1999 Bryan Street, Suite 900, Dallas TX 75201-3136. It may be served with process by serving its registered agent CT Corporation System at 350 N. St. Paul Street, Suite 2900, Dallas TX 75201-4234.

5. Defendant Baylor Regional Medical Center of Plano is a corporation with its Principal Office and its Registered Office at 350 N. St. Paul Street, Suite 2900, Dallas TX 75201-4234. This defendant may be served with process by serving its registered agent, CT Corporation System, at that address.

6. Defendants Baylor Health Care System d/b/a Baylor Regional Medical Center of Plano and Defendant Baylor Regional Medical Center of Plano will be referred to collectively in this Complaint as "the corporate Defendants" or simply "Baylor."

7. Defendant Kimberly Morgan, APN, is an individual who can be served with process at 5111 Cimmaron Circle, Allen, TX 75002.

## III.

## PRE- SUIT STATUTORY COMPLIANCE

8. Plaintiffs have complied with the pre-suit notice requirements of Texas Civil Practice and Remedies Code, Chapter 74.

## IV.

## FACTUAL BACKGROUND

9. Research studies show that from 1-in-10 physicians up to 1-in-6 physicians are impaired by drugs and/or alcohol. As a result, hospitals such as the corporate Defendants are required to have a patient safety system in place to identify them as well as those physicians who are obviously incompetent or impaired by drugs or alcohol.

10. In the Summer of 2011, the corporate Defendants entered into a joint venture with another corporate entity, MISI ASC DALLAS LC, to hire a spinal surgeon named Christopher Duntsch to perform spinal surgeries at the corporate Defendants' facility in Plano, TX. As part of that venture, the corporate Defendants paid MISI a large sum of money up-front to bring Duntsch to its facility and they also provided marketing efforts related to patient recruitment for Duntsch/Baylor Plano/MISI. Baylor/MISI/Duntsch finalized their venture and Duntsch came to town. Upon Duntsch's arrival, MISI President Michael Rimlawi, MD put Duntsch up in temporary housing at the W Hotel.

11. Duntsch's background, which at the time was known or knowable to the corporate Defendants through compliance with standards, included a long history of alcohol abuse, recreational drug use, including use of cocaine proximate to his treatment of patients. He also had a history of evading drug screen testing. For example, in Duntsch's residency program, he was reported for having used cocaine hours before participating in a surgery. He evaded drug testing for a number of days following that incident but ultimately tested positive for illicit substances. He was placed into an impaired physician treatment program. This was known or was knowable to the corporate Defendants through compliance with applicable standards.

12. The corporate Defendants failed to have Duntsch drug-tested prior to giving him privileges as

required by applicable standards.

13. Within weeks of arriving in Dallas, Duntsch's behavior was so erratic that he was deemed a danger to patients by MISI and the business venture was terminated by MISI. For example, Duntsch performed a surgery at the corporate Defendants' facility in Plano and then Duntsch went to Las Vegas without telling the hospital or MISI. The abandonment of this patient was not realized for about three days when the hospital staff called Rimlawi – who went to cover the patient. Rimlawi reported Duntsch's erratic behavior to Baylor and informed Baylor that Duntsch was not fit emotionally to be a surgeon but instead acted like a sociopath, a drug or alcohol abuser, or similar. This, along with other erratic behavior by Duntsch, was known or knowable by the corporate Defendants.

14. When the business venture between Baylor/MISI was terminated, Baylor chose to hire Duntsch as its agent or employee. Baylor had spent a lot of money on Duntsch and wanted it back. Therefore, Baylor reached an agreement with Duntsch that Baylor would provide Duntsch a location in an office building owned by Baylor Health Care System or one of its affiliated entities to use as his doctor's office and would give Duntsch a title, an additional stipend, and income guarantees.

15. Duntsch kept a gallon bottle of vodka under his desk at his office. He also kept drug paraphernalia in his desk. He was also abusing prescription medication. This was known or knowable to Baylor at the time through compliance with applicable standards.

16. At this time, Baylor requested Duntsch undergo testing for illicit drugs. Duntsch did not undergo the requested drug testing. Baylor ignored the adverse information it had regarding Duntsch and instead allowed him to perform surgeries at Baylor's Plano facility.

17. In the Fall of 2011, Duntsch's erratic and disorganized behavior continued. For example, he

did not follow proper procedures to get surgeries scheduled because he did not fill out the request forms properly. This resulted in surgeries having to be re-scheduled.

18. During this time, the corporate Defendants were actively promoting patient referrals to Duntsch.

19. During the Fall of 2011, Baylor employees and other staff participating in the surgeries witnessed a startling lack of surgical skill by Duntsch resulting in high blood loss or other complications.  Duntsch also had other alarming behaviors such as repeatedly urinating on the floor in the bathrooms and taking an unusually high number of bathroom breaks during surgeries. There was also an incident in which a bag of what appeared to be cocaine was found in Duntsch's bathroom.  This was known or was knowable by the corporate Defendants.

20. On December 30, 2011, Duntsch performed surgery on Plaintiff Leroy Passmore at one of the corporate Defendants' hospital facilities. During the surgery, a surgeon present in the operating room saw that Duntsch was doing things that were unusual and, soon, alarming.  Duntsch was causing a lot of bleeding [750 ml when the blood loss should only have been 50 ml], requiring two suction devices rather than one. Duntsch was operating near Passmore's spinal cord without having a clear view and the other surgeon objected to that vocally.  Duntsch began to remove a certain anatomical structure in Passmore's spine – the other surgeon objected to that as well.  The other surgeon, at one point, grabbed Duntsch's hands/surgical instruments and told him to stop.  Duntsch misplaced the surgical hardware in Passmore's spine – and stripped one of the placement screws which prevented the hardware from being removed and placed properly. The other surgeon told Duntsch that Duntsch was dangerous and he would never operate with Duntsch again.  This altercation was witnessed by the OR staff, including Baylor employees and Defendant Morgan.

21. None of the Baylor employees reported the altercation up the chain of command as required by nursing standards of care. None of them reported the altercation to the patient as required by nursing standards of care. In the alternative, if the altercation was reported up the chain of command, the corporate Defendants failed to inform the patient as required by applicable standards of care. The corporate Defendants similarly failed to immediately interview the witnesses. Had the witnesses been interviewed, the surgeon who had the altercation with Duntsch would have informed the corporate Defendants that Duntsch is "the most careless, clueless, and dangerous spine surgeon he had ever seen," and that Duntsch was going to "kill or maim" someone if allowed to continue. Such interviews would in a natural and continuous sequence have prevented the second Duntsch surgery on Passmore. More likely than not had Passmore been informed as required by applicable standards, Duntsch would have been removed from his case.

22. Had the altercation been reported to the patient as required, the second surgery would not have occurred.

23. Defendant Morgan did not report the altercation to the patient as required by nursing standards of care. Had such disclosure been made the second surgery by Duntsch on Passmore would have been prevented.

24. Had the altercation been reported, increased surveillance of Passmore would have resulted, more likely than not, and a competent spinal surgeon would have corrected Duntsch's mistakes timely salvaging Passmore's spine function and significantly reducing or completely eliminating his damages herein.

25. On January 6, 2012, Duntsch performed a second surgery on Passmore causing further harm. Passmore would not have consented to this surgery had he known of the altercation mentioned

above but would have brought in a competent spinal surgeon for corrective surgery.

26. Had the operating room nurses and Defendant Morgan reported the altercation of December 30 to the patient and the hospital chain of command timely, even superficial observation of Duntsch to evaluate his competence and skill would have resulted in his being removed from Passmore's case and most likely the surgery service at Baylor Plano. As proof of this, Plaintiffs offer the following events:

27. Plano on January 11, 2012, Duntsch performed surgery at the corporate Defendants' hospital in Plano resulting in serious injury to another patient. Surgeons who witnessed that surgery describe Duntsch as "an impaired physician, a sociopath [who] must be stopped from practicing medicine." They said his performance "was pathetic on what should have been an easy case – he had trouble from the start with getting the disc out, bleeding issues, poor visualization of the operative field and seemed to be struggling getting the interbody device into position – he was functioning at a first to second year neurosurgical resident level but had no apparent insight into how bad his technique was."

28. As further proof of his profound level of incompetence, Duntsch performed surgery on another patient on February 2, 2012 resulting in that patient's quadriplegia. Physicians involved with that case state that Duntsch caused excessive blood loss, needlessly cut a vertebral artery, caused an excessive delay in addressing neurological complications, ignored protests by anesthesia personnel to help the patient, and caused a catastrophic compression of the patient's spinal cord with bone and disc material. This patient reported to the nursing staff that the night before surgery he had used cocaine with Duntsch. The corporate Defendants took Duntsch off of the case and suspended him. Inexplicably, the corporate Defendants later allowed Duntsch to operate on other patients.

29. On March 12, 2012, Duntsch went on to perform surgery on yet another patient causing her death from needless vascular injury resulting from "horribly poor and clueless surgical technique," according to other surgeons.

30. Baylor Regional Medical Center of Plano suspended Duntsch's privileges. While under suspension, Duntsch resigned from Baylor Regional Medical Center of Plano. Baylor Regional Medical Center of Plano did not report the resignation to the National Practitioner Data Bank or to any other hospital as required by applicable standards.

31. Despite all of the foregoing, the corporate Defendants sent a letter of recommendation for Duntsch to Dallas Medical Center stating there were no adverse concerns, adverse events, or adverse issues associated with Duntsch.

32. When Duntsch got to Dallas Medical Center, he operated on a lady named Floella Brown and caused her death by a needless vascular injury resulting from what other surgeons have described as "horrendous surgical technique."

33. On yet another patient at Dallas Medical Center, Duntsch surgically removed one or more of the patient's spinal nerve roots and installed hardware intended for use in the bony structures of the spine into the muscles adjacent to the spine. This surgery was so poor one surgeon contacted Duntsch's training program to see if Duntsch was an imposter.

34. On June 10, 2013 Duntsch performed a surgery so horribly that the scrub nurses stopped him from operating further and the entire operating room staff ended up restraining Duntsch in the operating room.

35. On June 26, 2013, the Texas Medical Board suspended Duntschs's medical license on an emergency basis finding that Duntsch engaged in a pattern of improper preoperative planning, creation of and failure to recognize and treat complications, and he placed his patients at

significant risk of harm or death killing at least two patients. The Board also found Duntsch to be unable to practice safely due to impairment from drugs and alcohol finding him to be "an imminent peril to public health, safety, and welfare."

36. The foregoing paragraphs are probative evidence that had the corporate Defendants, the operating room nurses and Defendant Morgan acted in accordance with the nursing standards of care on December 30, 2011 the participating surgeon's opinion that Duntsch was the most careless, clueless and dangerous surgeon he had ever seen would have been validated and not only would Passmore not have been injured by the January 6 surgery, but likely the other patients described above would not have been maimed or killed.

37. The letter of recommendation Baylor sent to Dallas Medical Center is probative of Baylor's bad mental state and intent to harm.

## V.

## AGENCY

38. At all times, the nurses in the operating room on December 30, 2011 were acting, not only in their individual capacities, but also as agents, representatives, and/or employees of the corporate Defendants and acting within the scope of such agency/employment. Under the doctrines of agency and *respondeat superior*, the corporate Defendants are liable for the acts and omissions of these nurses.

39. The corporate Defendants are also responsible for the negligence of Christopher Duntsch as Duntsch was their actual or apparent agent or employee and/or by virtue of the joint venture relationship they had established with Duntsch in which they funded his work and his office practice, reached an agreement with him which included giving Duntsch a "Chief of …" title and actively marketed his services to referring physicians and the public, among other things.

40. The corporate Defendants also had a non-delegable duty to Leroy Passmore by virtue of their participation in the Medicare program. By so participating, the corporate Defendants voluntarily assumed the obligations of non-delegable duty set-out in 42 CFR § 482.12(e) and 42 CFR § 482.23. These obligations were violated when Baylor failed to provide safe surgical services to Passmore.

## VI.

## CAUSES OF ACTION

41. The corporate Defendants, acting through persons who were their actual, apparent, ostensible, or by estoppel agents or employees, committed acts and/or omissions in their healthcare treatment care of Leroy Passmore, which constituted negligence and/or which constituted violations of the applicable standards of care. These acts and/or omissions include the following:

   a. Failure to follow appropriate nursing practices and responsibilities including being patient advocates directly to the patient as well as toward the institution;

   b. Failing to properly and timely use the chain of command to report the altercation between Duntsch and that certain other surgeon on December 30, 2011;

   c. Failing to inform Passmore about the altercation between Duntsch and the other surgeon on December 30, 2011;

   d. Failing to timely interview the witnesses to the altercation in the operating room on December 30, 2011 and respond to that information properly;

   e. Failing to prevent Duntsch from performing surgery on Passmore on January 6, 2012 without informing Passmore of the altercation that took place in the operating room on December 30, 2011;

   f. Failure to follow proper credentialing standards prior to allowing Duntsch to perform surgery at the corporate Defendants' facilities and thereafter.

42. In addition to the foregoing, the corporate Defendants are liable for the acts or omissions and injuries caused by Duntsch pursuant to the joint venture they created with Duntsch. Each of them had an express or implied agreement for Duntsch to perform spinal surgeries at the corporate Defendants' facility in Plano for the common purpose of recruiting patients and performing spinal surgery on them in return for money for each participant in the venture. They had a community of pecuniary interest in the common purpose with the corporate Defendants putting in up-front cash to get the venture started, and they each had an equal voice in the direction of the enterprise. Thus, they are each liable to Plaintiffs for all injuries caused by the surgeries Duntsch performed pursuant to the joint venture arrangement with Baylor. Duntsch performed negligently in both surgeries causing injuries to Passmore by causing excessive blood loss and trauma to his spine, spinal cord and ligaments and by placing the interbody device improperly.

43. Defendant Morgan fell below applicable standards of nursing care by failing to inform Leroy Passmore of the altercation between Duntsch and the other surgeon on December 30, 2011, proximately causing harm to Passmore.

44. Each of such acts and omissions, singularly or in combination with others, was/were a proximate cause of injury to Passmore and damages to the other Plaintiffs for which Plaintiffs pray for judgment in an amount in excess of the minimum jurisdictional limits of the Court.

45. In addition to the foregoing, and pleading in the alternative, the conduct of the corporate Defendants in allowing Duntsch to perform surgery on Passmore was with malice as that term was defined at common law; to wit, Baylor acted with reckless disregard for the rights of others thus injuring Passmore. [*See Shannon v. Jones,* 76 Tex. 141, 13 S.W. 477, 478 (1890)(defining malice as a reckless disregard for the rights of others).]

46. In addition, and pleading in the alternative, if Texas Civil Practice and Remedies Code § 41.001(7) is deemed to require proof that the corporate Defendants had actual subjective intent to harm Passmore on the occasion in question before liability attaches, then Plaintiffs say that the legislature's act of deleting 41.001(7)(B) of the definition of "malice" (that allowed proof of gross negligence) violated the "Open Courts" provision of the Texas Constitution by eliminating a common law right arbitrarily in light of the purposes of the statute leaving only an impossible condition before liability will attach. [*See* Tex. Const. Art. I § 13]. In the past, § 41.001(7) passed constitutional muster because section (B) was included. [*See St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 506 (Tex. 1997)("Considering the Legislature's pronouncement that "malice" need not be directed toward a specific individual in the context of exemplary damages, it does not follow that in the context of peer review, the committee must necessarily act with malice toward a specific patient for that patient to prove his or her case.)] With the elimination of section (B) in 2003, Plaintiffs say the statute now violates the Texas Constitution if it requires an actual subjective intent to harm or injure the specific patient involved before liability attaches.

47. In addition to the foregoing, and pleading in the alternative, the conduct of the corporate Defendants in allowing Duntsch to perform surgery on Passmore was with malice as that term is defined in Texas Civil Practice and Remedies Code, § 41.001; to wit Baylor's conduct rises to the level of intent to harm.

48. In addition to the foregoing, and pleading in the alternative, the conduct of the corporate Defendants in allowing Duntsch to perform surgery on Passmore was with malice as that term is defined in Texas Civil Practice and Remedies Code, § 41.001; to wit Baylor's conduct rises to the level of specific intent to harm Leroy Passmore.

## VII.

## DAMAGES

49.   As a proximate result of the acts or omissions described above, singularly and collectively, Leroy Passmore suffered severe and permanent damage to his spine and can no longer work. He is in constant pain and requires life-long medical care for the pain and disability. This has disrupted his relationships with his spouse and children, as well. Plaintiffs are entitled to and seek compensatory damages and exemplary damages. Plaintiffs seek past and future damages for physical pain and mental anguish, physical impairment, disfigurement, medical expenses, loss of consortium, lost earnings, and loss of earnings capacity.

## VIII.

## JURY DEMAND

50.   Plaintiffs demand a trial by jury.

FOR THESE REASONS, respectfully pray that the Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiffs against Defendants, jointly and severally, for damages in an amount within the jurisdictional limits of this Court; exemplary damages, excluding interest, and as allowed by Tex.Civ.Prac.& Rem. Code § 41.008, together with pre-judgment interest (from the date of injury through the date of judgment) at

the maximum rate allowed by law; post-judgment interest at the maximum legal rate, costs of court; and such further relief to which Plaintiffs are justly entitled.

        Respectfully submitted,

        **THE GIRARDS LAW FIRM**

By: /s/ James E. Girards
   James E. Girards
   State Bar No. 07980500
   10000 North Central, Suite 400
   Dallas, Texas 75231
   Telephone 214.346.9529
   Facsimile 214.346.9532
   jim@girardslaw.com

   **ATTORNEYS FOR PLAINTIFFS**